# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| RESTORED IMAGES CONSULTING, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:14-CV-527-DGK |
| | ) | |
| DR. VINYL & ASSOCIATES, LTD., | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CHRISTOPHER COLLINS, | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

## <u>AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

This case presents a series of business disputes involving franchises that provide automobile cosmetic repairs. Plaintiff Restored Images Consulting, LLC ("Restored Images"), sued Defendant Dr. Vinyl & Associates, Ltd. ("Dr. Vinyl"), which impleaded Restored Images's sole member, Third-Party Defendant Christopher Collins ("Collins"). The parties tried eleven claims to the Court on January 12 and 13, 2016. Having considered the trial testimony and exhibits submitted, the Court now finds the facts and states its conclusions of law.

As explained more fully below, the Court finds that the only party to prove any of its claims is Restored Images against Dr. Vinyl on Count I. The Court awards damages in the amount of $10,000.00.

### Findings of Fact

The Court makes the factual findings below by giving substantial weight to Collins's testimony. Collins was confident and well-poised, and his testimony was inherently believable.

Most of his testimony was uncontroverted, including by Richard Reinders ("Reinders"), the other major witness. The Court withholds weight only from his testimony about calculations, where Collins seemed unsure and where the numbers did not add up when the Court tried to verify them.[1]

The Court gives slightly less weight to Reinders's testimony. Much of Reinders's testimony was uncontroversial and uncontroverted, which the Court accepts as true. Where Reinders testified contrary to Collins, the Court generally believed Collins because Reinders did not seem to thoroughly know his company's operational aspects even though he was the chief executive officer for many years. He aptly summarized this ignorance at trial, "The only thing I was aware of from 2009 with respect to business to my franchise owners [was] that it was a total mess. We lost in eight months about 40 percent of all our sales. And the only thing I was doing here was being motivational, because I really didn't know what was going on."

Several parts of Reinders's testimony support his statement. Reinders did not know whether Collins visited any franchisees in Texas or Oklahoma. He did not know whether or how all Dr. Vinyl payments were made to Restored Images. Reinders believed that Dr. Vinyl was dramatically overpaying royalties to Restored Images, but could not explain why he had made such a large mistake for nine and a half years. His testimony that he was not receiving daily updates on the company's finances is contradicted by Garringer, who testified that she spoke with Reinders every day about Dr. Vinyl business. While the downturn in Dr. Vinyl's business justifies Reinders's ignorance, it does not change it.

---

[1] Dr. Vinyl tried to impeach Collins with Exhibit 534, an affidavit he had submitted in another case in which he swears that Restored Images provides its subcontractors with proprietary trade secrets. The Court does not read his statements in Exhibit 534, which was admitted solely for impeachment purposes, to suggest that Restored Images's or Collins's proprietary information originated from Dr. Vinyl. Collins testified at trial that he developed his own proprietary techniques and skills while running his franchise. Because that testimony is consistent with his affidavit, the Court does not find Exhibit 534 to damage Collins's credibility.

Further, Reinders impeached himself. He testified that Restored Images was not the procuring cause of the Shawn Morris sale, but changed his testimony on cross-examination and admitted that Restored Images did sell Shawn Morris's franchise.

Four depositions are in evidence. The Court gives great weight to the testimony of Jamie Lasher ("Lasher"). Lasher was knowledgeable both as a Dr. Vinyl franchisee and as a Dr. Vinyl corporate officer. His testimony corroborated much of Collins's, including the testimony regarding Dr. Vinyl's lack of advertising.

The Court gives great weight to Sandra Garringer's testimony, mostly because she no longer works for Dr. Vinyl and seems impartial in this dispute. The Court does discredit her testimony that Dr. Vinyl was performing advertising because it contradicts Collins's and Lasher's testimony and because it was less specific than their testimony. Otherwise, the Court finds her testimony to be consistent with the other witnesses'.

The Court gives moderate weight to the testimony of the remaining deponents, Curtis Pribble, and Janet Pribble. The Court holds against Curtis Pribble his refusal to answer some of opposing counsel's questions. The Court holds against Janet Pribble her equivocation in answering many key questions, declaring that she could not recall. But mostly, their testimony is not relevant.

Accordingly, the Court finds the facts to be as follows.

Dr. Vinyl is a company headquartered in Lee's Summit, Missouri, that owns and franchises the "Dr. Vinyl" brand. Dr. Vinyl is in the business of repairing vinyl and other materials used in daily life. Despite the name, the services offered by Dr. Vinyl go beyond vinyl. Dr. Vinyl franchises dye leather and carpets, repair headliners, deodorize interiors, and touch up

paint chips.  Its franchises work in a decentralized fashion, servicing their customers onsite everywhere from car dealerships to massage parlors.

Dr. Vinyl has structured its franchise model in two ways.  It sells franchises directly to individuals and also to master franchises, which sell new franchises and promote existing franchises but do not themselves perform Dr. Vinyl services.

Chris Collins has served as both a Dr. Vinyl franchisee and a master franchisee.  His relationship with Dr. Vinyl began in 1996 when he bought a franchise in Texas.  Collins and Dr. Vinyl memorialized the purchase by signing a written franchise agreement ("Franchise Agreement").  Because he has previously gone by Chris Brown, Collins signed many documents relevant to this case, including the Franchise Agreement, with that name.

The Franchise Agreement gave Collins the right to operate Franchise #162, the territory of which was a swath of the northern Dallas area roughly bounded by three freeways.  Dr. Vinyl promised to support this franchise by using a national advertising fund to furnish Collins with marketing plans and materials.  (Ex. 1 ¶ 9(A)).

In exchange, Collins agreed to pay Dr. Vinyl a monthly royalty of 7% of gross sales, or $200, which is greater.  (*Id.* ¶ 6(B)).  Collins had to supplement these franchise fees with a monthly advertising fee of 1%, with a penalty of 1.5% assessed on late payments.  (*Id.* ¶ 9(A)).

Collins received very little training from Dr. Vinyl.  It gave him only two weeks of initial training, during which he learned the bare minimum about automobile surface repair.  Since then, Dr. Vinyl has provided no training to Collins except for a wheel repair conference in 2014 that he learned nothing from.  Although Dr. Vinyl held annual conventions for training purposes, Collins never learned techniques at those conventions.

Dr. Vinyl provides limited technical support for its franchisees. It maintains a restricted-access website with certain useful information, such as product descriptions, pertinent Environmental Protection Agency rules, and safety information.

Mostly, Collins learned his craft through self-instruction, for example through internet applications like YouTube. He has learned repair skills from suppliers, who demonstrate how to use their products to franchisees at conventions. Collins's case was not unique; Jamie Lasher, a franchisee in the Des Moines area and Dr. Vinyl's former chief operating officer, gained his knowledge the same way. Because of Dr. Vinyl's laissez-faire attitude toward training, there is little difference between Dr. Vinyl franchises and their competitors in terms of the services they offer.

Dr. Vinyl recognized how well Collins was doing on his own. It asked Collins to teach seminars so that other franchisees could learn from him, and specifically commended him in one of its training booklets for developing a new way of repairing fabric.

As with his repair skills, Collins built his customer base from scratch. Franchise #162 had lain dormant for six months before Collins bought it. Once he did, he began going directly to dealerships, offering free demonstrations, maximizing his face time with potential customers, and trying to win their business. Collins quickly developed his book of business, growing Franchise #162 more quickly than any other Dr. Vinyl franchise in the United States.

Collins found success even though Dr. Vinyl did not advertise for his franchise—either nationally or in the north Dallas/Fort Worth Metroplex—or provide any advertising materials. Dr. Vinyl made no attempts to advertise for Collins. Notwithstanding, through May 2014 Collins paid the monthly royalties and advertising fees that the Franchise Agreement required of him.

5

At a Dr. Vinyl convention in early 2004, Collins met Richard Reinders, Dr. Vinyl's chief executive officer. Reinders is from the Netherlands but lives in Austria, where Dr. Vinyl maintains some corporate operations. At the time, Reinders was looking to sell Dr. Vinyl master franchises. Thinking Collins might be a suitable prospect, Reinders invited him to the Dr. Vinyl center in Austria to discuss further.

Collins went to Austria that year, where Reinders showed him the company's books and tried to sell him on becoming a master franchisee. The men reached the outlines of a deal. Reinders would sell Collins a master franchise territory that was larger than his individual franchise territory, comprising all of Texas and Oklahoma. Collins would receive a percentage of the gross sales of the franchisees in that territory. Although Collins had previously sold three franchises to people he knew through his church, Reinders told him that he *could* sell franchises, but did not *have to* sell franchises.

When Collins returned to Texas, he formed a limited liability company called Restored Images Consulting, LLC, with the intent that Restored Images, not him personally, would be the master franchisee. On December 1, 2004, Dr. Vinyl and Restored Images signed a written, multipart Master Franchise Agreement ("MFA"). They supplemented the MFA with an Addendum two months later.

The MFA requires Restored Images to do two relevant things: (1) sell five franchises per year for five years, for a cumulative total of twenty-five franchises (Ex. 2, Ex. B); and (2) refrain from using "Confidential Information"—defined as knowledge of and experience in master franchise's operation—"in any other business or capacity." (*Id.* ¶ 5(a)).

Dr. Vinyl, for its part, must do two relevant things. First, it had to pay Restored Images $10,000.00 for each franchise it sells. (Ex. 3 ¶ 5). Second, it had to furnish Restored Images

6

with a Uniform Franchise Offering Circular ("UFOC") for the offer of Dr. Vinyl franchises. (Ex. 2 ¶ 2(A)). A UFOC is a disclosure document that sets out the franchisor's financials so that a prospective franchisee can make an informed decision about whether to buy a franchise.

Third, Dr. Vinyl had to pay annual royalties to Restored Images. (*Id.* ¶ 8(B)). The formula for calculating Restored Images's royalties is confusing at first glance and bears reproducing here:

---

### B.   <u>CONTINUING ROYALTY</u>

Franchisor shall pay a monthly royalty fee to Master Franchisee which shall be a percentage of the actual royalty fees received by Franchisor from franchisees sold by Master Franchisee in the Exclusive Area pursuant to each Franchise Agreement entered into between Franchisor and a franchisee operating a Dr. Vinyl Franchise in the Exclusive Area, in an amount equal to the following percentage of a franchisee's annual Gross Sales (as such term is defined in the Franchise Agreement) of the Dr. Vinyl Franchise which is the subject of such Franchise Agreement, during the period for which such fee is payable, as follows:

| Annual Royalty Fee Revenue Received by Us | Percentage of Annual Royalty Fee Received By Us and Paid to You |
|---|---|
| $1 to $125,000 | 20% |
| $125,001 to $200,000 | 35% |
| $200,001 to $235,000 | 42% |
| $235,001 and up | 50% |

---

The MFA contains three relevant housekeeping measures: (1) it says that the MFA constitutes the "entire full, complete agreement" between Dr. Vinyl and Restored Images on the MFA's subject matter, and that it supersedes all prior agreements (*id.* ¶ 17(M)); (2) it chooses Missouri law to govern the MFA's interpretation in the event of litigation (*id.* ¶ 17(G)); and (3) if Restored Images or Dr. Vinyl sues to enforce the MFA, "the party prevailing in that proceeding is

7

entitled to reimbursement of its costs and expenses incurred, including reasonable accounting and legal fees" (*id.* ¶ 17(E)).

Although the MFA was primarily a Dr. Vinyl-Restored Images contract, Collins signed one part of it. He personally guarantees any debts owed by Restored Images to Dr. Vinyl. (*Id.* Ex. C). For two years after the MFA expired, he promised not to divert business from Restored Images customers to any competitors, nor to induce Dr. Vinyl employees to leave Dr. Vinyl. (*Id.*).

The MFA was set to last for ten years, until November 30, 2014. Restored Images had the right to unilaterally renew the MFA. (Ex. 3 ¶ 13).

As soon as Restored Images signed the MFA, it began traveling over Texas and Oklahoma to visit franchise owners and help them develop the quantity and quality of their business. What it has not done is sell franchises. Restored Images has sold only one, to Shawn Morris ("Morris") in Oklahoma. Dr. Vinyl did not pay Restored Images a commission for that sale.

As Restored Images has sold only one franchise, it has never met the MFA's Development Schedule. Dr. Vinyl asked Restored Images about selling franchises, but Restored Images never responded positively. Dr. Vinyl's lack of response to that inaction indicates that Dr. Vinyl did not care that Restored Images was failing to sell franchises. For example, just two months after Restored Images bought its master franchise, Tom Buckley, Dr. Vinyl's franchise development director, invited Collins to a meeting where tips for selling franchises would be discussed. Collins did not go, believing he had no obligation to sell franchises. Dr. Vinyl never protested his nonattendance. Its conduct reflected apathy in this regard.

Similarly, when Restored Images emailed Dr. Vinyl about an unrelated issue, Reinders replied, "did you sell any franchises at all except from the guy in ok??", referring to the Morris sale. Restored Images responded that it would not be selling any more franchises for Dr. Vinyl because it was not contractually obligated to do so. Reinders did not press the point or otherwise insist on Restored Images complying with the Exhibit B Development Schedule.

In 2010, Lasher, Dr. Vinyl's then-chief operating officer, came to Texas to encourage Restored Images to sell more franchises. Restored Images reluctantly agreed to help sell franchises, but told Lasher that it first needed to have UFOCs in hand to offer prospective franchisees. Restored Images claims it never received a UFOC despite asking several Dr. Vinyl personnel. The Court finds that whether or not Restored Images received a UFOC is irrelevant. Restored Images later approached one of Collins's friends in Oklahoma to sell a franchise, but without a UFOC, Restored Images told the friend that it could not make the sale. Because Collins failed to describe this exchange in any detail, no evidence establishes a real likelihood that he would have made the sale but for lacking a UFOC.

After Lasher's visit, no one at Dr. Vinyl ever again asked Restored Images to sell franchises. Dr. Vinyl knew that Restored Images was not selling new franchises. Lasher told Reinders about Restored Images's noncompliance. Any new franchises would have been paying royalties to Dr. Vinyl. The Development Schedule established annual benchmarks that Restored Images was not meeting. Further, Garringer told Reinders when a master franchisee sold a franchise. Therefore, Dr. Vinyl knew early on that Restored Images was not selling.

From 2006 to 2014, Dr. Vinyl paid Restored Images what both parties believed were master franchise royalties. Accompanying each payment was a schedule that indicated the annual gross sales of each franchise owner in Texas and Oklahoma and the franchise fees they

paid to Dr. Vinyl. The Court finds accurate Exhibits 4 and 517, which detail some of these amounts. Dr. Vinyl paid Restored Images as follows:

| Year of Sales | Royalties Paid by Dr. Vinyl to Restored Images |
|---|---|
| 2005 | $32,259.11 |
| 2006 | $36,884.35 |
| 2007 | $42,568.68 |
| 2008 | $37,094.07 |
| 2009 | $34,967.07 |
| 2010 | $35,763.14 |
| 2011 | $35,028.41 |
| 2012 | $34,186.46 |
| 2013 | $28,300.96 |
| 2014 | — |
| 2015 | — |

Around 2013, Restored Images requested to extend the master franchise. Dr. Vinyl acknowledged the request but never affirmatively responded. Because Restored Images had the unilateral right to renew the MFA, it effectively extended the MFA through November 30, 2024.

In 2014, Collins attended a wheel training conference and spoke with Reinders. Reinders gave Collins the previous year's numbers, and projected that Restored Images would receive a considerably lower royalty payment. Collins began to believe that Dr. Vinyl was shortchanging Restored Images's royalty payments. At the same time, Dr. Vinyl began to suspect that it was overpaying Restored Images on royalties. Dr. Vinyl had never suspected that until 2014, which Reinders and Garringer later called a massive error. Dr. Vinyl made its last payment to Restored Images that year.

10

The deteriorating relations between Dr. Vinyl and Restored Images mirrored what was happening between Dr. Vinyl and Collins as an individual franchisee. In January 2015, Collins told Dr. Vinyl that he was terminating the Franchise Agreement retroactively to June 1, 2014, for Dr. Vinyl's purported breaches of that agreement. Collins made his Franchise #162 fee payment in May 2014. From June 1, 2014, through its expiration on December 31, 2015, the Franchise Agreement called on Collins to pay Dr. Vinyl $121,293.51, which he did not pay.

After renouncing the Franchise Agreement, Collins continued providing automobile surface repairs just as he had as a Dr. Vinyl franchisee, but now under the name Restored Images. Restored Images signed a license agreement in November 2014 with Cody Agraz ("Agraz"), a Dr. Vinyl subcontractor with whom Collins had worked when he was still a Dr. Vinyl franchisee. The new contract scrubbed references to Dr. Vinyl and contained only Restored Images's name. Restored Images signed similar agreements with Shelby Granger ("Granger") and Scott Barthel ("Barthel"), also former subcontractors who worked with Collins on Franchise #162 but then came aboard Restored Images's new venture.

Throughout the time Agraz, Granger, and Barthel worked as Dr. Vinyl subcontractors and then as Restored Images contractors, Collins taught them the repair techniques he had developed over the years. Collins trained them differently than the way Dr. Vinyl trains its employees. Granger alone received some training from Dr. Vinyl, but the training he received was so deficient, Collins had to retrain him.

This litigation commenced on June 10, 2014, when Restored Images sued Dr. Vinyl. Dr. Vinyl counterclaimed Restored Images and impleaded Collins.

Although Restored Images and Dr. Vinyl nominally brought eleven claims to trial, the parties have not been clear about what, exactly, they are suing over. For example, Restored Images pled that its claim for unpaid royalties originated from an oral contract that mirrored the written contract, but its complaint identified only the oral contract as the one that was breached. After trial, Restored Images decided that the nonpayment of royalties was actually a breach of the *written* contract, and asked the Court for permission to transmogrify the oral contract breach claim into a promissory estoppel claim. Restored Images has also waffled between whether Missouri or Texas law applies.

But Restored Images is not the only party guilty of confusion. Dr. Vinyl asked for and received dismissal of Count III of its complaint against Collins. But in the proposed conclusions of law Dr. Vinyl submitted after trial, it urged the Court to find for it on Count III. Dr. Vinyl also pled several affirmative defenses that it appears to have abandoned sometime before trial.

In ruling on the various claims, the Court has cross-referenced the pleadings with the supporting evidence at trial. On those premises, the Court has identified the relevant law, which it now applies to the facts as found.

## I. Dr. Vinyl is liable to Restored Images on only Count I.

Restored Images brings three counts in its Second Amended Complaint (Doc. 29): breach of the MFA (Count I); breach of the purported oral contract (Count II); and another breach of the MFA, alternatively styled as a violation of a Texas law requiring franchisors to provide UFOCs (Count III).

## A. Dr. Vinyl is liable to Restored Images for $10,000.00 for breaching the MFA's Addendum.

In Count I, Restored Images claims that Dr. Vinyl breached the MFA by failing to pay Restored Images a commission for selling a franchise to Shawn Morris, and its master franchisee royalty fees.

To prove a breach of contract claim, the plaintiff must show: "(1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance pursuant to the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff." *Keveney v. Mo. Military Acad.*, 304 S.W.3d 98, 104 (Mo. 2010).[2]

### 1. The MFA is unambiguous in all relevant ways.

The Court must first decide what the relevant MFA terms are. The interpretation of a contract is a question of law. *Schmitz v. Great Am. Assur. Co.*, 337 S.W.3d 700, 705 (Mo. 2011). If a contract is unambiguous, then the court must apply the contract as written. *Id.* at 706. An ambiguity exists if the terms are "reasonably open to different constructions." *Burns v. Smith*, 303 S.W.3d 505, 509 (Mo. 2010).

The parties contest the interpretation of two MFA provisions. First, the MFA's Exhibit B imposes a Development Schedule under which Restored Images must sell five franchises per year for five years, for a cumulative total of twenty-five franchises. Collins argues that Exhibit B was null from the beginning because he made an oral contract with Reinders in Austria in January 2004 that excused him from selling franchises. However, *Collins* made this purported oral contract, not Restored Images. Restored Images did not exist until ten months later. Therefore, no provision from a Collins-Dr. Vinyl contract can benefit Restored Images. *See*

---

[2] Except for Count III of Dr. Vinyl's complaint against Restored Images, the parties apply Missouri law in their proposed conclusions of law, and the MFA mandates that Missouri law applies to claims arising from the MFA. Therefore, the Court applies Missouri law to all counts in all complaints, except as later discussed with Count III.

*Landstar Invs. II, Inc. v. Spears*, 257 S.W.3d 630, 632 (Mo. Ct. App. 2008) ("[A] contract generally binds no one but the parties thereto . . . .").[3]

Even if Restored Images could somehow enforce rights in Collins's supposed oral contract against Dr. Vinyl, Paragraph 17(M) of the MFA states that it "constitute[s] the entire full, complete agreement between [Dr. Vinyl] and [Restored Images] concerning the subject matter of this Master Franchise Agreement and shall super[s]ede all prior agreements." The MFA's requirement that Restored Images sell franchises thus trumps any oral agreement excusing Restored Images from selling franchises. *See Johnson ex rel. Johnson v. JF Enters., LLC*, 400 S.W.3d 763, 769 (Mo. 2013) ("[A] written agreement may not be varied or contradicted by evidence of extrinsic agreements."); *Berry v. Crouse*, 376 S.W.2d 107, 112–13 (Mo. 1964) (holding that where parties signed one agreement and then several hours later signed another, contradictory one, the latter agreement superseded the former even without a merger clause).

The second contested part of the MFA, Paragraph 8(B), is confusing at first blush, but it is not ambiguous. Again, Paragraph 8(B) reads:

---

[3] Restored Images has made no argument that it is entitled to enforce the putative oral contract as a third-party beneficiary. *See State ex rel. William Ranni Assocs., Inc. v. Hartenbach*, 742 S.W.2d 134, 141 (Mo. 1987).

### B. <u>CONTINUING ROYALTY</u>

Franchisor shall pay a monthly royalty fee to Master Franchisee which shall be a percentage of the actual royalty fees received by Franchisor from franchisees sold by Master Franchisee in the Exclusive Area pursuant to each Franchise Agreement entered into between Franchisor and a franchisee operating a Dr. Vinyl Franchise in the Exclusive Area, in an amount equal to the following percentage of a franchisee's annual Gross Sales (as such term is defined in the Franchise Agreement) of the Dr. Vinyl Franchise which is the subject of such Franchise Agreement, during the period for which such fee is payable, as follows:

| Annual Royalty Fee Revenue Received by Us | Percentage of Annual Royalty Fee Received By Us and Paid to You |
|---|---|
| $1 to $125,000 | 20% |
| $125,001 to $200,000 | 35% |
| $200,001 to $235,000 | 42% |
| $235,001 and up | 50% |

Paragraph 8(B) establishes that Dr. Vinyl must pay a monthly royalty fee to Restored Images. To figure out how much that fee should be, the MFA starts with the annual gross sales of "franchises sold by Master Franchisee." As Restored Images sold one franchise, to Shawn Morris, Dr. Vinyl owes Restored Images only for royalties derived from Morris's franchise.

Then, the chart in Paragraph 8(B) gives a menu of percentages, which apply based on how much the sold franchises' annual gross sales were. Because Morris's annual gross sales never exceeded $6,504.88, only the 20% value ever applied.

That answers how much the percentage is; the next question is what that percentage comes out of. The MFA says that Restored Images is owed "a monthly royalty fee . . . which shall be a percentage of the actual royalty fees." The relevant column header below is labeled,

"Percentage of *Annual Royalty Fee* Received By Us and Paid to You" (emphasis added).[4]  Thus, the amount that Dr. Vinyl must pay Restored Images is a percentage of the royalty fees that the sold franchisees paid to Dr. Vinyl.  As applied here, Dr. Vinyl must pay Restored Images 20% of the royalty fees that Morris paid to Dr. Vinyl.

### 2.  Dr. Vinyl waived its right to make Restored Images sell franchises.

Next, Restored Images must prove that it performed its own obligations under the MFA. Dr. Vinyl argues that Restored Images failed to sell franchises, and failed to observe the confidentiality agreement.

### a.  Although Restored Images did not sell the required number of franchises, Dr. Vinyl waived its right to make Restored Images sell franchises.

Restored Images did not perform under the MFA's Development Schedule, because it did not sell franchises according to the MFA's Development Schedule.  Instead of selling twenty-five franchises from 2004 through 2009, Restored Images sold just one, in 2007.  Restored Images argues, however, that Dr. Vinyl waived its right to enforce that provision because it knew Restored Images was not performing yet did nothing to demand compliance.

Under Missouri law, a party may waive any favorable contractual provision.  *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 851 (8th Cir. 2014).  A waiver must be intentional. *Id.*  It may be shown by the party's conduct, but the conduct must be "clear, unequivocal, and decisive act[s] . . . so consistent with intent to waive that no other reasonable explanation is possible." *Id.*

Dr. Vinyl intended to give up its right to enforce the franchise-selling requirement against Restored Images.  Restored Images sold only one franchise, well short of what the Development

---

[4] Confusingly, Paragraph 8(B) also says that Restored Images is due a "percentage of a franchisee's annual Gross Sales," just one comma after it says that Restored Images is due a "percentage of the actual royalty fees received by [Dr. Vinyl]."  Because Dr. Vinyl does not contest that the latter is the better reading of this provision, the Court uses the franchisees' royalty fees, not their gross sales, to calculate the money Dr. Vinyl owes Restored Images.

Schedule required. Dr. Vinyl was aware that Restored Images was not meeting its annual franchise sales quota. On Restored Images's behalf, Collins emailed Dr. Vinyl to declare that he was not going to sell franchises. Collins refused to attend meetings on franchise sales, insisting (incorrectly) that Restored Images did not have to sell franchises. Lasher talked to Reinders about Restored Images's demands. Dr. Vinyl collected royalties from all franchisees in Texas and Oklahoma, so it knew that Restored Images was not selling any franchises.

Despite knowing this, Dr. Vinyl never demanded performance for over nine years, nor did it terminate the MFA for nonperformance. Significantly, Dr. Vinyl continued to pay Restored Images. Dr. Vinyl has no excuse for this prolonged indifference. The inference the Court draws is that Dr. Vinyl unequivocally surrendered its right to make Restored Images sell franchises. Therefore, Restored Images is excused from complying.

#### b. Restored Images observed the confidentiality agreement.

Next, Restored Images must prove that, in accordance with the MFA's Paragraph 5, it refrained from disclosing "Confidential Information," or Dr. Vinyl's proprietary knowledge and experience.

Restored Images did not breach the confidentiality agreement. Restored Images did teach some cosmetic repair techniques to its subcontractors Cody Agraz, Shelby Granger, and Scott Barthel. But these techniques were not Dr. Vinyl's. They came instead from Collins, who taught himself this information from the internet, for example through YouTube videos, and from suppliers.

Collins did not learn this information from Dr. Vinyl, which gave him negligible training and follow-up. Although Dr. Vinyl held annual conventions for training purposes and maintained a website which offered some information, Collins received no training at those

conventions and never visited the website, so Restored Images's techniques did not come from those sources.

These techniques were proprietary techniques generally, but not Dr. Vinyl's proprietary techniques. Therefore, Restored Images's techniques were not "Confidential Information" as used by the MFA.

Besides the waived Paragraph 8(B), Restored Images performed every one of its obligations.

### 3. Dr. Vinyl never paid Restored Images a commission for selling Morris a franchise.

Restored Images must next prove that Dr. Vinyl failed to perform an obligation under the MFA. Restored Images claims that Dr. Vinyl breached two MFA provisions: (1) the obligation to pay Restored Images $10,000 for each franchise Restored Images sells; and (2) the annual royalty payment provision.

With respect to the first question, Dr. Vinyl breached its promise to pay Restored Images for $10,000 for each franchise sold. Restored Images sold a franchise to Shawn Morris, but Dr. Vinyl did not pay a commission. Therefore, Dr. Vinyl breached.[5]

With respect to the second question, Dr. Vinyl did not breach its promise to pay Paragraph 8(B) royalties to Restored Images. As discussed above, Dr. Vinyl should have paid Restored Images 20% of the royalty fees that Morris paid to Dr. Vinyl. By those calculations, Dr. Vinyl owed Restored Images a total of $7,587.44 from 2005 through 2013. Even assuming that Morris's 2014 and 2015 royalties matched his 2013 royalties—which the Court finds no evidence of—Dr. Vinyl would owe Restored Images a total of $10,189.40 from 2005 through

---

[5] Dr. Vinyl has not argued that Restored Images waived this provision.

2015. Because Dr. Vinyl actually paid Restored Images several times that—$317,052.25, to be precise—Dr. Vinyl did not breach Paragraph 8(B).

Restored Images appears to argue that Dr. Vinyl waived the limitation that royalty fees were based off of franchises sold, as opposed to all franchises in Restored Images's territory—a reading of the MFA unsupported by its plain language. In Restored Images's view, Dr. Vinyl waived the Morris-only limitation just as it waived the Development Schedule's requirement that Restored Images sell franchises.

The difference between Paragraph 8(B)'s restriction on master franchisee royalties and the Development Schedule is that the Development Schedule was a right held by Dr. Vinyl. A right may be waived only the party that holds that right. *Topchian*, 760 F.3d at 851. The Development Schedule was subject to waiver by Dr. Vinyl because it was Dr. Vinyl's right; the Development Schedule inured to its benefit.

In contrast, Paragraph 8(B) did not give *Dr. Vinyl* any rights to waive. It instead described a right held by *Restored Images*, that is, its right to collect fees. The MFA restricted that right by limiting the recoverable fees to those derived from franchises sold by Restored Images. Not being the right's holder, Dr. Vinyl could not waive it.

Restored Images seems to argue that even if Dr. Vinyl was not *contractually* obligated to pay it based on all Texas and Oklahoma franchises' annual gross sales, Dr. Vinyl orally promised to do so. This promissory estoppel theory fails because a party cannot enforce another party's promise through promissory estoppel when they made an unambiguous contract on the same subject matter. *Clearly Canadian Beverage Corp. v. Am. Winery, Inc.*, 257 F.3d 880, 890 (8th Cir. 2001) (applying Missouri law); *Hamra v. Magna Grp., Inc.*, 956 S.W.2d 934, 939 (Mo. Ct. App. 1997) ("Promissory estoppel cannot be utilized to engraft a promise on a contract that is

different from its written terms."). Because the MFA unambiguously covers Dr. Vinyl's obligation to pay Restored Images master franchisee royalties, Restored Images cannot wield promissory estoppel to expand that obligation. Therefore, even if the Court were to entertain Restored Images's belated promissory estoppel argument, it would be rejected.

### 4. Restored Images has suffered $10,000.00 in actual damages.

Finally, Restored Images must prove that Dr. Vinyl's breach of contract caused it damages. Damages for breach of contract should "compensate a party for a legally recognized loss." *Ameristar Jet Charter, Inc. v. Dodson Int'l Parts, Inc.*, 155 S.W.3d 50, 54 (Mo. 2005). Toward that end, different types of damages may be available to a prevailing plaintiff in a breach of contract action. *Catroppa v. Metal Bldg. Supply, Inc.*, 267 S.W.3d 812, 817–18 (Mo. Ct. App. 2008). Restored Images has elected to recover actual damages, which are compensatory and aim to place the injured party "in the position he would have been in had the contract been performed." *Boten v. Brecklein*, 452 S.W.2d 86, 93 (Mo. 1970).

Dr. Vinyl's sole breach of the MFA is for failing to pay Restored Images $10,000.00 per franchise sold. To place Restored Images in the position it would have been in had Dr. Vinyl performed under the MFA, Dr. Vinyl must pay Restored Images $10,000.00.

### 5. The limitations period does not bar Restored Images's claim.

Although Restored Images has proven one of its breach of contract claims, Dr. Vinyl raises the affirmative defense of limitations. A party has five years to file an action for breach of any contract "except those mentioned in section 516.110." Mo. Rev. Stat. § 516.120(1). Section 516.110, instead, gives a party ten years to bring "an action upon any writing . . . for the payment of money." *Id.* § 516.110(1). This means that the longer, ten-year period "applies to every breach of contract action in which the plaintiff seeks a judgment from the defendant for payment

of money the defendant agreed to pay in a written contract." *Rolwing v. Nestle Holdings, Inc.*, 437 S.W.3d 180, 183 (Mo. 2014) (emphasis removed).

Here, the contract that Dr. Vinyl breached, the MFA, was a written contract in which Dr. Vinyl promised to pay money. Restored Images seeks a payment of money in accordance with that contract. Therefore, the longer limitations period applies.

Restored Images sold a franchise to Shawn Morris in 2007. Even assuming that Dr. Vinyl was obligated to immediately pay Restored Images its $10,000 commission, the injury of nonpayment accrued no earlier than 2007. Therefore, Restored Images satisfied the ten-year statute of limitations by filing this lawsuit in June 2014.

Dr. Vinyl's amended answer (Doc. 44) asserts four other affirmative defenses: unclean hands, waiver, estoppel, and laches. Dr. Vinyl did not address those affirmative defenses in its schedule of claims that the Court ordered the parties to file a week before the pretrial conference. Nor did it address those defenses in its proposed conclusions of law. Therefore, these remaining defenses are waived. *See Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 721 (8th Cir. 2008).

In sum, the Court finds for Restored Images on Count I in the amount of $10,000.00.

**B. Restored Images never made an oral contract with Dr. Vinyl.**

In Count II, Restored Images claims that Dr. Vinyl breached Collins's and Dr. Vinyl's oral agreement pertaining to the payment of royalty fees from Dr. Vinyl. The threshold question is whether the parties made an oral contract. The Court finds they did not. Again, Restored Images did not exist until ten months after Collins and Reinders met in Austria and made any oral contract. Any contract, then, was between Collins and Dr. Vinyl, and Restored Images has made no argument that it should be able to enforce the contract of another. *See Landstar Invs. II, Inc*, 257 S.W.3d at 632. To the extent Restored Images may be arguing that Collins assigned his

rights to the oral contract to Restored Images, the MFA's Paragraph 17(M) merger clause defeats that argument. Therefore, the Court finds for Dr. Vinyl on Count II.

### C. Even if Dr. Vinyl failed to give Restored Images a UFOC, it did not cause Restored Images any damages.

In Count III, Restored Images claims that Dr. Vinyl failed to provide it a UFOC. The source of this claim is unclear. In its complaint, Restored Images casts this as a violation of the Texas Business and Commerce Code. Tex. Bus. & Comm. Code § 51.003(b)(8)(A). In its schedule of remaining claims for trial, Restored Images says this is a breach of the MFA. In its proposed conclusions of law, Restored Images says it was both. The Court, although frustrated with Restored Images's inconsistency and inability to pin down the basis for its lawsuit, finds that Restored Images has raised both sources of law as a source of possible redress for this injury.

#### 1. Dr. Vinyl caused no damages for any breach of the MFA.

The Court first considers whether Dr. Vinyl breached the MFA by failing to give a UFOC to Restored Images. The relevant term is Paragraph 2(A): "Franchisor shall furnish Master Franchisee the Dr. Vinyl Uniform Franchise Offering Circular for the offer of Dr. Vinyl franchises." Restored Images appears to seek both actual damages and lost profits damages for breach of Paragraph 2(A).

But even assuming that Dr. Vinyl breached Paragraph 2(A), Restored Images has not suffered damages. Restored Images first asks for $240,000, the amount that it paid Dr. Vinyl to operate as a master franchisee. But Restored Images was never hampered in operating its master franchise. There is no evidence that lacking a UFOC prevented Restored Images from promoting, selling, or growing franchises to such a degree that it was effectively unable to function. Restored Images identified only a single prospect to whom it would have sold a

franchise if only it had had a current UFOC. Frustrating a single sale does not justify throwing out the entire MFA, and would not put Restored Images in the same position it would have been in had Dr. Vinyl given it a UFOC. Therefore, the Court finds that Restored Images does not require any sum of money to make it whole for Dr. Vinyl's assumed breach of Paragraph 2(A).

Restored Images also seeks lost profits. For each franchise sold, Restored Images would have been entitled to a $10,000 commission, plus a cut of the new franchise's royalties. Restored Images argues that lacking a UFOC prevented it from earning that money.

"Loss of profits refers to the amount of net profits a plaintiff would have realized if its clients had not been lost as a result of a defendant's actions." *Ameristar Jet Charter*, 155 S.W.3d at 54. "For an award of lost profits damages, a party must produce evidence that provides an adequate basis for estimating the lost profits with reasonable certainty." *Id.*

Here, Restored Images did not produce enough evidence to leave the Court reasonably certain that Restored Images suffered any lost profits. Collins asked several Dr. Vinyl officers for a UFOC because he wanted to help Dr. Vinyl sell franchises generally, and because he wanted to comply with Texas law requiring UFOCs. But there is no evidence showing that he had a reasonable chance of completing a sale but for a UFOC. The only specific prospect Collins identified was a friend in Oklahoma. But the sale was never imminent and likely, nor did it hinge on the friend being able to review a UFOC. The Court does not believe that lacking a UFOC caused this sale to fall through. Therefore, the Court finds royalties that Restored Images would have earned but for a UFOC to be too speculative to count as compensable lost profits.

The Court finds that even if Dr. Vinyl breached Paragraph 2(A), Restored Images suffered no damages.

**2. Dr. Vinyl caused no damages for any violation of the Texas Business Opportunity Act.**

Alternatively, Restored Images claims that Dr. Vinyl's breach violated the Texas Business Opportunity Act, which creates a private right of action against a franchisor who fails to provide a prospective franchisee with a disclosure document. Tex. Bus. & Com. Code §§ 51.301, 51.003(b)(8)(A); *see* 16 C.F.R. §§ 436.3–.5. The Court assumes without deciding that Texas law applies to this claim.

This claim fails because, as discussed above, Dr. Vinyl's failure to provide a UFOC did not cause Restored Images any damages. Damages for violations of the Texas Business Opportunity Act are calculated as either actual damages or lost profits damages, just like breach of contract under Missouri law. *See Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 817 (Tex. 1997). Because Restored Images suffered neither actual damages nor lost profits from Dr. Vinyl's failure to provide a UFOC, the Texas Business Opportunity Act does not give Restored Images a basis to recover more than it can recover for Missouri breach of contract. The Court therefore finds for Dr. Vinyl on Count III.

In sum, the Court finds for Restored Images on Count I and for Dr. Vinyl on Counts II and III.

**II. Dr. Vinyl fails to prove any of its claims against Restored Images.**

In its Second Amended Counterclaim (Doc. 44), Dr. Vinyl asserts five claims against Restored Images: breach of the MFA for accepting royalty overpayments (Count I); unjust enrichment (Count II); conversion (Count III); breach of the MFA for revealing trade secrets (Count IV); and tortious interference with a business expectancy (Count V).

**A. Restored Images did not breach the MFA because no provision required it to refund royalty overpayments.**

In Count I, Dr. Vinyl alleges that Restored Images breached the MFA because Dr. Vinyl sent money—which Dr. Vinyl claims was erroneously overpaid royalty fees—to Restored Images in the amount of $309,464.80, which Restored Images will not return.

This claim fails because Dr. Vinyl has not proven that Restored Images breached any provision of the MFA. Dr. Vinyl identifies no provision of the MFA that requires Restored Images to refund royalty overpayments. To the contrary, Restored Images complied with every one of its obligations except for the Development Schedule, which Dr. Vinyl waived. Therefore, the Court finds for Restored Images on Count I.[6]

**B. Dr. Vinyl cannot prove a claim of unjust enrichment because its overpayments to Restored Images were voluntary.**

Count II rests on the same facts as Count I. Dr. Vinyl claims Restored Images has been unjustly enriched by keeping the royalty overpayments. To state a claim for unjust enrichment, a plaintiff must prove that: "(1) [it] conferred a benefit on the defendant; (2) the defendant appreciated the benefit; and (3) the defendant accepted and retained the benefit under inequitable and/or unjust circumstances." *Binkley v. Am. Equity Mortg., Inc.*, 447 S.W.3d 194, 199 (Mo. 2014).

---

[6] Restored Images's primary argument against this claim rises from the affirmative defense of voluntary payment. The Supreme Court of Missouri has consistently permitted voluntary payment against equitable claims, most often unjust enrichment. *E.g.*, *Huch v. Charter Commc'ns, Inc.*, 290 S.W.3d 721, 726 (Mo. 2009). Less clear is whether the Supreme Court of Missouri would apply voluntary payment to breach of contract claims. *See United Fire & Cas. Co. v. Titan Contractors Serv., Inc.*, 751 F.3d 880, 883 (8th Cir. 2014) ("[Where] Missouri substantive law governs[, the court is] bound by the decisions of the Supreme Court of Missouri. If the Supreme Court has not addressed an issue, [the court] must predict how the court would rule . . . ."). The Eighth Circuit has implied that it might, but in dicta. *Affordable Cmtys. of Mo. v. Fed. Nat'l Mortg. Ass'n*, 815 F.3d 1130, 1134 (8th Cir. 2016) (applying Missouri law and holding on alternative grounds that the plaintiff's voluntary payments precluded its breach of contract claim, without addressing whether Missouri recognizes that defense for breach of contract claims). *But see, e.g.*, *BMG Direct Mktg., Inc. v. Peake*, 178 S.W.3d 763, 775 (Tex. 2005) (in another state applying the common law doctrine of voluntary payment, refusing to apply it to a breach of contract claim). Because Dr. Vinyl has failed to prove its claim as described above, the Court need not decide the voluntary payment issue.

The Court proceeds to Restored Images's affirmative defense, which is that Dr. Vinyl's royalty overpayment was voluntary. Under the voluntary payment doctrine, a company cannot recover money that it paid to another party unless it made the payments under fraud, duress, or a mistake of fact. *Huch v. Charter Commc'ns, Inc.*, 290 S.W.3d 721, 726 (Mo. 2009). In contrast, a company that paid money "solely by a mistake of law" is not entitled to recover that money. *Id.* "A mistake of law occurs where a person is truly acquainted with the existence or nonexistence of facts, but is ignorant of, or comes to an erroneous conclusion as to, their legal effect." *Ballard v. City of Creve Coeur*, 419 S.W.3d 109, 123 (Mo. Ct. App. 2013).

Here, Dr. Vinyl did not overpay Restored Images under fraud or duress. It made a mistake, but its mistake was not one of fact. Dr. Vinyl had all the necessary facts: it knew how many franchises Restored Images had sold, and the annual gross sales of those franchises. Its mistake arose from parsing the MFA's unambiguous Paragraph 8(B). Interpretation of that contract, as discussed earlier, is a question of law. As best as the Court can determine, Dr. Vinyl paid Restored Images as much as it did because it believed that it had to under the MFA—and thus the law, since interpreting a contract is a question of law. Therefore, Dr. Vinyl's mistake was one of law. *See Howard v. Turnbull*, 316 S.W.3d 431, 439 (Mo. Ct. App. 2010) (barring a claim for unjust enrichment because of voluntary payment, where the payee was simply mistaken that he could enforce contracts to which all parties were not signatories); *cf. DeCoursey v. Am. Gen. Life Ins. Co.*, 822 F.3d 469, 475–77 (8th Cir. 2016) (holding that an insurer was entitled to restitution under Missouri law notwithstanding its voluntary payment, because it had mistakenly believed that the policy had not lapsed and that the policy's beneficiary had never submitted a claim on the policy before—mistakes of *fact*). Because Dr. Vinyl was burdened with ensuring

that it was accurately paying its master franchisee, it is not entitled to recover the overpayments it made to Restored Images. The Court therefore finds for Restored Images on Count II.

### C. Because Dr. Vinyl unconditionally gave Restored Images the overpaid royalties, it cannot prove conversion.

Count III tries a different tack to recover the overpaid royalties, by alleging conversion. Conversion is the "unauthorized assumption of the right of ownership over the personal property of another to the exclusion of the owner's rights." *Fleischmann v. Mercantile Trust Co. Nat'l Ass'n*, 617 S.W.2d 73, 73 (Mo. 1981). One type of conversion is wrongfully refusing to give up possession of property. *Chem. Sales Co. v. Diamond Chem. Co.*, 766 F.2d 364, 367 (8th Cir. 1985) (applying Missouri law).

To succeed on a conversion claim, Dr. Vinyl must prove that: (1) it "owned the property or was entitled to possess it;" (2) Restored Images "took possession of the property with the intent to exercise some control over it; and (3) [Restored Images] thereby deprived [Dr. Vinyl] of the right to possession." *Herron v. Barnard*, 390 S.W.3d 901, 909 (Mo. Ct. App. 2013). "It is a plaintiff's burden to 'prove his right to immediate possession of the property at the time suit was filed, and that defendant was then wrongfully detaining the same.'" *Green*, 286 S.W.3d at 240.

Dr. Vinyl falters on the third element. Dr. Vinyl owned the money and then gave Restored Images the money, but Restored Images did not deprive Dr. Vinyl of the right of possession. Rather, Dr. Vinyl freely gave Restored Images all rights to the $309,464.80, no strings attached. Dr. Vinyl retained no right to possess the master franchise royalty overpayments, and Restored Images was free to do with that money what it pleased, including refusing to return it to Dr. Vinyl. "This is not a case where [Dr. Vinyl] asked [Restored Images] to hold the specific [royalty payments] for safekeeping, or directed that the [royalty payments] should be applied only" for a specific purpose. *Capitol Indem. Corp. v. Citizens Nat'l Bank of*

*Fort Scott, N.A.*, 8 S.W.3d 893, 900 (Mo. Ct. App. 2000); *cf. Dillard v. Payne*, 615 S.W.2d 53, 55 (Mo. 1981) (holding that where a client had given money to his attorneys to pay costs in a case he anticipated filing, but the attorneys withdrew from representation before the suit was filed and refused to return the money, the client had stated a claim for conversion of the conditionally conveyed money). Therefore, Restored Images's possession was not to the exclusion of Dr. Vinyl's. *See Fleischmann*, 617 S.W.2d at 73. The Court finds for Restored Images on Count III.[7]

### D. The non-compete agreement did not bind Restored Images, so it is not liable on Count IV.

In Count IV, Dr. Vinyl accuses Restored Images of violating the MFA's trade-secret provision and the MFA's non-compete clause. As discussed above, Restored Images did not violate the trade-secret provision.

As for the non-compete provision, Dr. Vinyl alleges that Restored Images violated that clause by contracting with Agraz, Granger, and Barthel to provide vehicle interior repair services to customers after the MFA supposedly expired.

Exhibit C of the MFA prohibits "Covenantor"—meaning Collins personally—from diverting business from Restored Images customers to any competitors, and from inducing Dr. Vinyl employees to leave Dr. Vinyl, for a period of two years after the MFA expires. Even assuming that Exhibit C is a valid contract, it imposes obligations on Collins, not Restored Images. Therefore, Dr. Vinyl cannot prove that Restored Images breached this provision.

Dr. Vinyl appears to suggest that Restored Images also breached Paragraph 12(A) of the MFA, which prohibited Restored Images from employing, or inducing to leave Dr. Vinyl

---

[7] Restored Images again invokes the defense of voluntary payment. Because the Court is unconvinced that voluntary payment applies to conversion claims, *see also supra* note 6, the Court resolves this claim on an alternative, simpler ground.

employment, any person "employed by or at" Dr. Vinyl or any of its franchises. The Court finds that Dr. Vinyl has abandoned this claim. The schedule of remaining claims that Dr. Vinyl filed before trial did not cite Paragraph 12(A), which is buried in a contract that runs over fifty pages, single-spaced. Dr. Vinyl's schedule mentioned Restored Images being liable for taking away Dr. Vinyl's *customers*, not its *employees*. At trial, Dr. Vinyl's attorney questioned the witnesses on the MFA's Exhibit C only. Trial Tr. 58–59, 161–64, 249–50, 262–64, 443–44 (Docs. 137, 138). The attorneys engaged in a colloquy about how Exhibit C was "the" non-compete agreement, and Restored Images's attorney repeatedly brought up that Collins, not Restored Images, had signed Exhibit C. Dr. Vinyl never moved to clarify this point to opposing counsel or the Court. No attorney or witness raised or mentioned Paragraph 12(A).

The first time that Dr. Vinyl asserted this provision appears to have been in its proposed findings of fact, where Dr. Vinyl offhandedly cited the page on which Paragraph 12(A) appears. (Doc. 141 at 3). But Dr. Vinyl did not mention that provision in its proposed conclusions of law for Count IV. (*Id.* at 12–13). Therefore, the Court finds that Dr. Vinyl raised this theory of its case for the first time after trial. As a matter of basic fairness, the Court will not now permit Dr. Vinyl to rely on Paragraph 12(A). The Court finds for Restored Images on this part of Count IV.

### E. Restored Images did not tortiously interfere with a business expectancy because Dr. Vinyl had no valid business expectancy and suffered no damages.

In Count V, Dr. Vinyl charges tortious interference with a business expectancy. Specifically, Dr. Vinyl alleges that Restored Images is stealing away Dr. Vinyl's customers, suppliers, and contractors.

To prove tortious interference with a business expectancy claim, Dr. Vinyl must show: (1) a valid business expectancy; (2) Restored Images's knowledge of the expectancy; (3) intentional interference by Restored Images inducing or causing a breach of the expectancy;

(4) absence of justification; and (5) damages. *Cent. Trust & Inv. Co. v. Signalpoint Asset Mgmt., LLC*, 422 S.W.3d 312, 324 (Mo. 2014).

This claim fails on at least the first element: Dr. Vinyl has failed to prove any valid business expectancy. A valid business expectancy is a "reasonable expectation of economic advantage or commercial relations." *Sloan v. Bankers Life & Cas. Co.*, 1 S.W.3d 555, 565 (Mo. Ct. App. 1999). A business expectancy can arise through a regular course of prior dealings and through contracts. *W. Blue Print Co. v. Roberts*, 367 S.W.3d 7, 19 (Mo. 2012).

Although Restored Images was working with three Dr. Vinyl contractors—Agraz, Granger, and Barthel—Dr. Vinyl has not shown that Restored Images's relationships with those contractors precluded any economic advantage to any degree of reasonable likelihood. For example, Dr. Vinyl has not shown that it maintained regular dealings or contracts with those individuals, or that it is losing business because they now contract with Restored Images exclusively.

Additionally, Dr. Vinyl fails on the fifth element: it has not shown damages. Even if Restored Images tortiously interfered with Dr. Vinyl's relationships with Agraz, Granger, and Barthel, Dr. Vinyl has not shown what effect that interference had. It has not suggested so much as a dollar of harm. Therefore, the Court finds for Restored Images on Count V.

### III. Dr. Vinyl fails to prove any of its claims against Collins.

Dr. Vinyl brings three counts in its Amended Third Party Complaint against Collins (Doc. 44): breach of the guaranty agreement (Count I); breach of the MFA for failing to pay Dr. Vinyl a percentage of his monthly sales (Count II); and tortious interference with a business expectancy (Count IV).[8]

---

[8] The Court previously dismissed Count III without prejudice, on Dr. Vinyl's motion (Doc. 102).

**A. Collins is not liable on his guaranty because Restored Images owes Dr. Vinyl no debts.**

In Count I, Dr. Vinyl alleges that Collins signed a contract in which he promised to be personally liable for any of Restored Images's breaches of the MFA. Under the theory that Restored Images has breached the MFA, Dr. Vinyl seeks to recover the sums owed from Collins pursuant to his guaranty.

"A guaranty, a species of contract, is a collateral agreement for another's undertaking and is an independent contract that imposes responsibilities different from those imposed in the agreement to which it is collateral." *Dunn Indus. Grp., Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 434 (Mo. 2003). "To recover on a contract of guaranty, [Dr. Vinyl] must show (1) that [Collins] executed the guaranty, (2) that [Collins] unconditionally delivered the guaranty to [Dr. Vinyl], (3) that [Dr. Vinyl], in reliance on the guaranty, thereafter extended credit to [Restored Images], and (4) that there is currently due and owing some sum of money from [Restored Images] to [Dr. Vinyl] that the guaranty purports to cover." *ITT Commercial Fin. Corp. v. Mid-America Marine Supply Corp.*, 854 S.W.2d 371, 382 (Mo. 1993).

Under Exhibit E of the MFA, Collins agreed to be personally liable for any breach of the MFA by Restored Images. Dr. Vinyl has failed to prove that Restored Images is indebted to Dr. Vinyl in any way, much less for breaching the MFA. Therefore, Dr. Vinyl has failed to prove the fourth element of this claim. The Court finds for Collins on Count I.

**B. Dr. Vinyl's substantial breach of Franchise Agreement #162 excuses Collins's failure to make franchise fee payments.**

Count II charges Collins with breaching the Franchise Agreement by failing to pay his franchise fees. Per Paragraph 6(B), Collins had to pay Dr. Vinyl 7% of its monthly gross sales—or $200, whichever was greater—plus an advertising fee and a late fee if applicable. Dr. Vinyl,

in turn, had to use a national advertising fund to furnish Collins with marketing plans and materials.

Dr. Vinyl has not proven the second element of its claim, which requires Dr. Vinyl to show its own "substantial compliance with the terms of the contract." *Weitz Co. v. MH Washington*, 631 F.3d 510, 524 (8th Cir. 2011) (applying Missouri law). This fact-intensive inquiry asks "if the deviation from the contract was slight and if the other party received substantially the same benefit it would have from literal performance." *Id.* Making an honest effort to comply is also relevant. *McAlpine Co. v. Graham*, 320 S.W.2d 951, 954 (Mo. Ct. App. 1954).

Dr. Vinyl has not proved that it substantially complied with its obligations under the Franchise Agreement. Specifically, Dr. Vinyl breached Paragraph 9(A) by not providing any advertising for Collins's franchise. It did not advertise nationally or locally in Collins's territory, nor did it give him marketing materials. Honest efforts were lacking. Dr. Vinyl thus abdicated its Paragraph 9 responsibilities.

The evidence is scant on whether Collins received the same benefits from owning a Dr. Vinyl franchise without advertising help as he would have received had Dr. Vinyl provided advertising help. Dr. Vinyl carries the burden of proving this, however, and the Court does not find it more likely true than not true that Dr. Vinyl's performance of Paragraph 9 would have had no effect on Collins. Therefore, Dr. Vinyl's breach was substantial. *See Pepsi Midamerica v. Harris*, 232 S.W.3d 648, 654 (Mo. Ct. App. 2007) (finding that a delivery driver was justified in breaching his employment agreement, because the employer promised to provide $2,500 worth of training to a driver and did provide some training to a driver, but the trial court found that the training received was not worth $2,500 and so the employer had not substantially complied).

Dr. Vinyl cannot prove the second element of its claim, so the Court finds for Collins on Count II.

### C. Dr. Vinyl's tortious interference with a business expectancy claim fails because Dr. Vinyl has not proved any valid business expectancy.

In Count IV, Dr. Vinyl claims that Collins is contacting Dr. Vinyl's customers, suppliers, and contractors and stealing away their business, thus tortiously interfering with Dr. Vinyl's business expectancies.

As with Dr. Vinyl's tortious interference claim against Restored Images, Dr. Vinyl has failed to prove any valid business expectancy. Collins worked with three Dr. Vinyl contractors—Agraz, Granger, and Barthel—but in his capacity as Restored Images. Dr. Vinyl has not shown that Collins's relationships with those contractors precluded any economic advantage to any degree of reasonable likelihood. For example, it has not shown that it maintained regular dealings or contracts with those men. *See Cent. Trust & Inv. Co.*, 42 S.W.3d at 324.

Nor has Dr. Vinyl shown damages. Even if Collins tortiously interfered with Dr. Vinyl's relationships with Agraz, Granger, and Barthel, Dr. Vinyl has not shown what effect that interference had. It has not suggested so much as a dollar of harm. *See W. Blue Print Co.*, 367 S.W.3d at 19. Therefore, the Court finds for Collins on Count IV.

### IV. Restored Images is entitled to costs, and the parties are directed to brief the issue of attorneys' fees.

Finally, Restored Images and Collins seek costs and attorneys' fees. Costs are ordinarily available to the "prevailing party," Fed. R. Civ. P. 54(d)(1), which is defined by federal law. *Humann v. KEM Elec. Co-op., Inc.*, 497 F.3d 810, 813 (8th Cir. 2007). A plaintiff prevails when it "secures an enforceable judgment on the merits." *CRST Van Expedited, Inc. v. EEOC*, 136 S. Ct. 1642, 1646 (2016) (internal quotation marks and alteration omitted). A defendant is a

prevailing party if a judgment is entered in his favor after trial, *Poe v. John Deere Co.*, 695 F.2d 1103, 1108 (8th Cir. 1982), or if the plaintiff dismisses a claim against him without prejudice, *Sequa Corp. v. Cooper*, 245 F.3d 1036, 1037–38 (8th Cir. 2001); *see CRST Van Expedited*, 136 S. Ct. at 1651. When the court finds for more than one adverse party, the party that won the larger judgment can be the prevailing party. *Hillside Enters. v. Carlisle Corp.*, 69 F.3d 1410, 1416 (8th Cir. 1995).

Restored Images succeeded on the vast majority of the claims it was party to, and is the only party that won any enforceable judgments. Collins succeeded on every claim against him. Restored Images and Collins are therefore entitled to costs. Restored Images and Collins must file a bill of costs in accordance with Local Rule 54.1(a).

Restored Images and Collins also seek to recover attorneys' fees from Dr. Vinyl. The availability of attorneys' fees in diversity cases is governed by state law. *Grabinski v. Blue Springs Ford Sales, Inc.*, 203 F.3d 1024, 1027 (8th Cir. 2000). "If a contract provides for the payment of attorneys' fees and expenses incurred in the enforcement of a contract provision, the trial court must comply with the terms of the contract and award them to the prevailing party." *DocMagic, Inc. v. Mortg. P'ship of Am., L.L.C.*, 729 F.3d 808, 812 (8th Cir. 2013) (applying Missouri law). If the contract awards fees to the "prevailing party" but does not define that term, then the court "must look to Missouri law for the interpretation of this term." *Id.*

In a legal proceeding arising from the MFA, the MFA awards reasonable attorneys' fees to "the party prevailing in that proceeding." (Ex. 2 ¶ 17(E)). Because the MFA does not define that phrase, the Court must use Missouri's definition of "prevailing party."

Missouri's definition of "prevailing party" is murkier than federal law's. *DocMagic*, 729 F.3d at 813–14 (summarizing Missouri's two, possibly conflicting approaches to identifying the

prevailing party); *see also Barkley, Inc. v. Gabriel Bros., Inc.*, No. 13-01013-CV-W-JTM, 2015 WL 2342052, at *4 (W.D. Mo. May 14, 2015), *aff'd in relevant part*, — F.3d —, 2016 WL 3974161, at *9 (8th Cir. 2016). Given the complexities of Missouri law here, the Court would like additional briefing from the parties before deciding which party prevailed for attorneys' fees purposes. The Court therefore directs the parties to file a Rule 54(d)(2)(A) motion if they believe that the Court's judgment entitles them to recover attorneys' fees.

## Conclusion

For the reasons above, the Court enters judgment on Count I of Restored Images Consulting, LLC's complaint against Dr. Vinyl & Associates, Ltd., in favor of Restored Images, in the total amount of $10,000.00. The Court enters judgment on all other claims in Restored Images's complaint in favor of Dr. Vinyl. The Court enters judgment on Dr. Vinyl's counterclaims against Restored Images in favor of Restored Images. The Court enters judgment on Dr. Vinyl's third-party complaint against Christopher Collins in favor of Collins. The parties are ordered to address costs and fees in the manner described above.

**IT IS SO ORDERED.**

Dated:  July 27, 2016             /s/ Greg Kays
                                GREG KAYS, CHIEF JUDGE
                                UNITED STATES DISTRICT COURT